IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Rebecca Dawn Brownlee-Nobs, | ) | C/A No.: 1:14-3988-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On March 21, 2011, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on March 31, 2008. Tr. at 105, 106, 175–81. Her applications were denied initially and upon reconsideration. Tr. at 137–42, 145–47, 148–50, 184–91. On April 30, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 25–56 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 5, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–24. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 14, 2014. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 38 years old at the time of the hearing. Tr. at 31. She completed a master's degree in communication. Tr. at 33. Her past relevant work ("PRW") was as a medical records clerk, a medical coding clerk, a hospitality manager, a travel agent, and a preventive maintenance coordinator. Tr. at 51. She alleges she has been unable to work since March 31, 2008. Tr. at 31.

2.    Medical History

On March 18, 2008, Plaintiff presented to neurologist Michael D. Kaufman ("Dr. Kaufman") for an initial assessment. Tr. at 421. Plaintiff related to Dr. Kaufman a history of symptoms beginning in 1992 that had progressively worsened. *Id.* Dr. Kaufman indicated a recent MRI of Plaintiff's brain showed four relatively small periventricular lesions that were suspicious for multiple sclerosis ("MS"). *Id.* A lumbar puncture indicated evidence of MS and other problems were ruled out. Tr. at 421–22. Plaintiff endorsed the following symptoms: feeling cold all the time, pain in her arms and legs, headaches one to three times per week, double vision, eye twitching, weakness, stiffness, leg spasms, difficulty falling asleep and staying asleep, tiredness throughout the day, and ongoing depression. Tr. at 422. Dr. Kaufman noted that Plaintiff underwent cervical fusion, lap band surgery for weight loss, and hernia repair surgery at age 32. *Id.* Dr. Kaufman indicated Plaintiff had decreased vibration sense in her left toes and brisk left knee and ankle jerks. Tr. at 423. He noted that Plaintiff had a very low lesion load, but her MRI, spinal fluid test, and family history that were compatible with MS. *Id.* He diagnosed relatively mild relapsing remitting MS and prescribed Topamax for Plaintiff's headaches and Provigil for energy. *Id.* Dr. Kaufman provided Plaintiff information regarding the four immunodilators and indicated Plaintiff should follow up in four to six weeks to determine the best course of treatment. Tr. at 423–24.

Plaintiff followed up with Dr. Kaufman on April 28, 2008, and reported improved sleep and decreased headaches on Topamax. Tr. at 419. Plaintiff discussed with Dr.

Kaufman the prescription options available to treat MS and decided to start Rebif. *Id.* Dr. Kaufman indicated Plaintiff should follow up in three months to discuss her use of Rebif. Tr. at 420.

On July 23, 2008, Plaintiff reported to Dr. Kaufman that she had experienced no side effects from Rebif. Tr. at 416. Dr. Kaufman noted that Plaintiff had discontinued Topamax because she did not believe it reduced the frequency of her migraines. *Id.* Plaintiff indicated she was reluctant to take Adderall because of its cost and because she typically took a daily nap. *Id.* Dr. Kaufman noted Plaintiff had difficulty with tandem walking, but identified no other abnormalities on examination. Tr. at 417. He prescribed Imitrex and instructed Plaintiff to return in six weeks for additional lab tests. Tr. at 417–18.

Plaintiff presented to Dr. Kaufman on October 14, 2008. Tr. at 413–15. She indicated she was tolerating Rebif well, but indicated Topamax had not decreased the frequency of her headaches and Provigil had not helped her fatigue. *Id.* Dr. Kaufman indicated the cranial nerve exam showed some subjective decrease in sensation over the left side of Plaintiff's face, but was otherwise normal. Tr. at 414. He stated the motor examination was normal, except for a brisk left knee jerk and the sensory exam was normal, except for a decrease to pinprick in the fingers of Plaintiff's right hand. *Id.* His impression was "[r]elapsing, remitting, relatively mild multiple sclerosis without recent disease activity on Rebif." *Id.* Dr. Kaufman indicated he was prescribing Amantadine for energy, but encouraged Plaintiff to discontinue the medication if she did not notice

improvement. *Id.* He raised Plaintiff's dosage of Imitrex to 50 milligrams and indicated Plaintiff should follow up in six months for an MRI. *Id.*

On April 7, 2009, Plaintiff reported to Dr. Kaufman that her headaches had improved since her medications were changed. Tr. at 267. Dr. Kaufman noted that Plaintiff had gained 20 pounds over the prior six-month period. *Id.* He indicated one of Plaintiff's main problems was an aching back, for which she visited Dr. Lencke. Tr. at 267–68. He stated a recent MRI of Plaintiff's lumbar spine showed a right lateral disc protrusion at the inferior aspect of the L5 vertebral body that did not protrude into the foramen or compress the nerve root or spinal cord. Tr. at 268. Dr. Kaufman observed Plaintiff to have slightly weak finger-spreading on the left and ankle dorsiflexion. *Id.* She had slightly increased reflexes on her left side. Tr. at 268–69. Dr. Kaufman indicated an impressions of "[r]elatively mild multiple sclerosis," back pain atypical of MS, and history of cervical fusion and stomach banding that may impact her myelopathy. Tr. at 269. He recommended Plaintiff take 4000–5000 units of Vitamin D3 and prescribed Miralax for constipation, Adderall XR for energy, and Celebrex for back pain. Tr. at 270. He also referred Plaintiff for therapy and back-strengthening exercises. *Id.*

Plaintiff participated in physical therapy at Progressive Physical Therapy from September 28 to November 6, 2009. Tr. at 282–309.

Plaintiff presented to Dr. Kaufman on October 16, 2009. Tr. at 263. She indicated that she had recently experienced a two-day period of heaviness in her right leg and difficulty lifting it. Tr. at 263. She also complained of tingling and burning in her right

5

leg and an intermittent shocking sensation in her right shoulder. *Id.* She reported left neck pain from a recent automobile accident. Tr. at 264. She complained of restless legs, ongoing headaches, problems with cognition, and difficulty remembering things. *Id.* Dr. Kaufman indicated Plaintiff was able to tandem walk. *Id.* Plaintiff's language, attention, and concentration were within normal limits. Tr. at 265. She demonstrated no decrease in muscle strength in her upper or lower extremities. *Id.* She had a brisk right reflex and very brisk knee reflex. *Id.* She had normal sensation and no difficulties with vibration, position sense, or pinprick. *Id.*

On December 16, 2009, Plaintiff indicated to Stuart L. Cooper, M.D. ("Dr. Cooper"), that Imipramine did "a pretty good job" of preventing her headaches, but that she still had headaches once a week. Tr. at 331. She stated that Imitrex was effective in treating her headaches. *Id.* She complained of fatigue as a result of MS. *Id.*

Plaintiff presented to Dr. Cooper for follow up on March 17, 2010. Tr. at 328. She indicated her migraines were under control and that she took Imitrex as needed. *Id.* She stated she was no longer taking Rebif for MS because of its cost. *Id.* She complained of pain in her right arm and shoulder and numbness and discomfort in her legs. *Id.* She reported a little weakness in her hands and stated she had been dropping things. *Id.* Plaintiff had gained nine pounds since her last visit in December 2009. *Id.* Dr. Cooper observed Plaintiff to have good range of motion in her neck and shoulders. *Id.* Plaintiff had normal motor strength and deep tendon reflexes in her upper and lower extremities. *Id.*

On March 30, 2010, an MRI of Plaintiff's cervical spine showed her previous anterior discectomy and interbody fusion at C5-6, but was otherwise unremarkable. Tr. at 319.

On September 22, 2010, Plaintiff complained to Dr. Cooper of migraines, fatigue, recurrent urinary tract infections, and hypertension. Tr. at 326. Dr. Cooper indicated Plaintiff had been unable to see Dr. Kaufman because of expense. *Id.* Plaintiff reported increased fatigue over the prior two-month period. *Id.* She also complained of numbness in her right thigh and facial tingling. *Id.* She stated her neck pain had improved, but indicated she had good and bad days. *Id.* Plaintiff's weight had increased by nine pounds since her last visit and she weighed 238 pounds. *Id.*

Plaintiff presented to Dr. Cooper on March 23, 2011, complaining of hypertension and migraines. Tr. at 325. Dr. Cooper indicated nine Imitrex tablets typically lasted Plaintiff one to one-and-a-half months, but that she had four days of migraines in a row the prior week. *Id.* He stated Plaintiff's MS symptoms included fatigue and mild numbness in the legs and that Plaintiff was not on any treatment for MS at the time. *Id.* He refilled Plaintiff's medications and instructed her to follow up in six months. *Id.*

On September 14, 2011, Plaintiff saw Vasant L. Garde, M.D. ("Dr. Garde"), for an orthopedic consultative examination. Tr. at 373–75. Plaintiff complained of vertigo, fatigue, frequent headaches, leg and arm weakness, and upper body tingling and weakness. Tr. at 373. She also reported a burning sensation with numbness and tingling in her leg. Tr. at 374. Plaintiff endorsed forgetfulness and difficulty with word formation.

7

*Id.* Dr. Garde indicated Plaintiff had no difficulty sitting, standing, or walking and was able to walk a mile and to drive. *Id.* He observed Plaintiff to walk with a normal gait and pace and indicated she had normal ROM in her spine and limbs. Tr. at 375. A straight-leg raising test was normal. *Id.* Plaintiff had normal grip in her left hand, but 4/5 grip in her right hand. *Id.* Plaintiff had sluggish reflexes on the right, but normal reflexes on the left. *Id.* Plaintiff's knee flexion and hip flexion were limited. Tr. at 376. Dr. Garde indicated Plaintiff's mental function was satisfactory. *Id.* He stated Plaintiff had dull sensation over her upper and lower extremities. *Id.* His clinical impressions were MS by history, migraine, hypertension, obesity, status post-lap band surgery, and history of diaphragmatic hernia surgery. *Id.*

Plaintiff followed up with Dr. Cooper on September 20, 2011, and reported migraines, fatigue, dizziness, and hypertension. Tr. at 381. She stated she was experiencing migraines three to five times per week. *Id.* She indicated Excedrin was often effective, but her headaches required her to take Imitrex once or twice a week. *Id.* Plaintiff stated she felt like her fatigue was worse. *Id.* She reported numbness and weakness in her left leg that lasted for a few hours before going away, chronic right-sided weakness, and lightheadedness. *Id.* Dr. Cooper refilled Plaintiff's medications and indicated he would refer her to a neurologist at the Medical College of Georgia. Tr. at 382.

State agency medical consultant James Weston, M.D. ("Dr. Weston"), completed a physical residual functional capacity ("RFC") assessment on September 29, 2011, and

found Plaintiff to have the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; limited feeling on the right as a result of "pronounced decreased sensation"; and avoid all exposure to hazards. Tr. at 88–91.

Plaintiff visited Conigliaro Jones, M.D. ("Dr. Jones"), for a consultative examination on January 31, 2012. Tr. at 390–93. She complained of MS, frequent migraine headaches, memory loss, chronic fatigue, and generalized pain and weakness. Tr. at 390. She reported being extremely tired and fatigued all the time. *Id.* She indicated she experienced three to four migraine headaches per week that were becoming more debilitating. *Id.* She endorsed pain in her back, legs, and arms. *Id.* She stated she had recently begun to experience problems with forgetfulness and lapses in memory. *Id.* Dr. Jones observed Plaintiff to have full ROM of her extremities. Tr. at 392. Plaintiff was able to get on and off the examination table without difficulty and to walk with good balance and without an assistive device. *Id.* She demonstrated good fine-finger dexterity and normal grip strength. *Id.* Dr. Jones' impressions were history of MS, history of hypertension, chronic headaches, chronic urinary tract infections, morbid obesity, and history of transient episodes of vertigo. Tr. at 392–93.

Plaintiff presented to A. Nicholas DePace, Ph. D. ("Dr. DePace"), for a psychological evaluation on March 5, 2012. Tr. at 395–98. She indicated she interacted

with numerous friends through the internet, but rarely interacted with friends in person. Tr. at 395–96. She reported she continued to drive, but indicated she became lost and made poor decisions while driving. Tr. at 396. She stated she engaged in cooking and cleaning, did laundry, managed her funds, cared for her children, and engaged in basic personal hygiene. *Id.* She indicated she typically got up around 11:00 a.m., exercised for a half-hour, showered, prepared her husband's lunch, checked email, picked up her son from school, prepared dinner, prepared her son for bed, spent time with her older children, and watched television with her husband before going to bed. *Id.* She stated she enjoyed reading romance and mystery novels in the past, but did not enjoy reading as much as she used to because she was unable to remember what she read. *Id.* Plaintiff indicated her sleep was disturbed because of leg pain. *Id.* She stated she worried about changes in her life and had difficulty remembering and producing words in conversation. *Id.* Dr. DePace indicated Plaintiff demonstrated no prominent word retrieval or speech production issues. Tr. at 397. Plaintiff asked that directions be repeated on several occasions and became frustrated and tearful at times. *Id.* Dr. DePace indicated "she did appear to put forth appropriate effort here today and, consequently, the results that are discussed in the next section are felt to represent an accurate assessment of her current levels of functioning." *Id.* Plaintiff obtained a full-scale IQ score of 89. *Id.* Individual scores were as follows: 100 in verbal-comprehension, 94 in perceptual reasoning, 95 in working memory, and 76 in processing speed. *Id.* Dr. DePace noted that Plaintiff's working memory score was in the borderline range, but that all of her other scores were

10

in the average range. *Id.* Plaintiff achieved a score in the seventy-seventh percentile on the Wide Range Achievement Test–Fourth Edition ("WRAT–4"), which was consistent with college-level abilities. *Id.* Dr. DePace indicated Plaintiff had chronic adjustment disorder with anxiety and that cognitive disorder, NOS, should be considered. *Id.* Dr. DePace indicated Plaintiff was functioning on a higher level than her full-scale IQ score indicated as a result of deficits in her processing speed that may be impacted by her medication regimen and her physical functioning. Tr. at 398. He stated he believed Plaintiff remained capable of performing three-step commands. *Id.* Dr. DePace indicated Plaintiff's concentration was in the average range, but he suggested it may be impaired in comparison to her past functioning. *Id.*

On March 15, 2012, state agency medical consultant Lindsey Crumlin, M.D., adopted the same restrictions as Dr. Weston. Tr. at 115–18.

On March 22, 2012, state agency psychological consultant Samuel Goots, Ph. D., completed a psychiatric review technique and considered Listing 12.04 for affective disorders. Tr. at 113–14. He found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 113. He indicated the following:

> THIS CLAIMANT HAS SYMPTOMS WHICH ARE CONSISTENT WITH AN ADJUTMENT [sic] DISORDER RELATED TO HER MEDICAL CONDITION. HER MENTAL CONDITION IS NOT CURRENTLY OF LISTING LEVEL SEVERITY AND, IN AND OF ITSELF, DOES NOT APPEAR TO IMPOSE SEVERE, WORK-

RELATED    FUNCTIONAL    LIMITATIONS.    HER    MENTAL
CONDITION IS RATED AS NS[1] AT THIS TIME.

Tr. at 114.

Plaintiff visited Mitzi Williams, M.D. ("Dr. Williams"), at The MS Center of
Atlanta for an initial consultation on June 12, 2012. Tr. at 464. She reported having more
bad than good days and complained of difficulty with multitasking, memory, and word
finding. *Id.* She reported spasticity and burning paresthesias in her bilateral legs that were
worse on the right than on the left. *Id.* She indicated she alternated between being
constipated and having diarrhea and had frequent urinary tract infections and vision
problems. *Id.* Plaintiff stated her fatigue had recently worsened. *Id.* Dr. Williams
observed Plaintiff to have decreased sensation to light touch and nearly absent reaction to
vibration in her right leg. *Id.* She had normal motor strength, but brisk reflexes. *Id.*
Plaintiff was able to tandem walk, but demonstrated impairment in heel-to-shin, finger-
to-nose, and rapid alternating movement testing. *Id.* Dr. Williams described Plaintiff's
gait as broad-based and spastic. *Id.* She recommended disease-modifying therapy,
referred Plaintiff for MRIs of her cervical spine and brain and blood tests, and instructed
her to follow up in two weeks for further management and treatment recommendations.
Tr. at 466.

On June 25, 2012, an MRI of Plaintiff's thoracic spine was generally normal, but
showed nonspecific diminution in the fatty marrow signal throughout the thoracic spine.

---

[1] "NS" means "non-severe."

Tr. at 444. A cervical MRI indicated mild degenerative changes, but no findings to suggest demyelinating disease. Tr. at 447. An MRI of Plaintiff's brain showed several nonspecific foci of periventricular white matter signal alteration. Tr. at 448.

On July 3, 2012, Plaintiff complained to Dr. Williams that her fatigue was worsened by the heat. Tr. at 462. She indicated that she had previously been on low-dose Adderall, but stated that it did not improve her fatigue. *Id.* Plaintiff reported painful paresthesias in her right leg. *Id.* She stated her sleep had improved with over-the-counter medications, but indicated she did not feel rested when she awoke. *Id.* She reported irritability and mood swings. *Id.* She indicated she exercised on a treadmill for 30 to 45 minutes at a time, but felt more fatigued and had more difficulty functioning after she exercised. *Id.* Dr. Williams indicated the cervical MRI showed a very mild lesion load with one black hole in the periventricular white matter. *Id.* She discussed with Plaintiff conservative management of her fatigue, including cooling techniques, rest and naps as needed, and sleep hygiene. Tr. at 463. Dr. Williams encouraged Plaintiff to continue to exercise, but instructed her to do so for a shorter period and to build her way up to more sustained activity. *Id.* She indicated Plaintiff should restart Rebif. *Id.*

Plaintiff followed up with Dr. Cooper on August 23, 2012. Tr. at 452–53. She reported a recent increase in migraines. Tr. at 452. Dr. Cooper noted that prophylactic medications had not helped in the past and that Imitrex was not treating Plaintiff's migraines as well as it had in the past. *Id.* Plaintiff also complained of night sweats. *Id.* Dr. Cooper switched Plaintiff's migraine medication from Imitrex to Maxalt and her

13

blood pressure medication from Lisinopril to Inderal LA. *Id.* He instructed Plaintiff to follow up in four weeks. *Id.*

On September 4, 2012, Plaintiff presented to Dr. Williams for further evaluation of MS. Tr. at 459. Dr. Williams indicated Requip caused Plaintiff to experience flu-like symptoms and an injection-site reaction. *Id.* She stated a cervical MRI showed a lesion at C4-5 without enhancement. *Id.* Dr. Williams instructed Plaintiff to use ibuprofen before taking Requip and stated she would consider alternate therapy if ibuprofen did not improve Plaintiff's symptoms. Tr. at 460.

Plaintiff presented to Emilio Perez-Jorge, M.D. ("Dr. Perez-Jorge"), in Dr. Cooper's office for evaluation of night sweats on September 25, 2012. Tr. at 494–95. Plaintiff endorsed symptoms of MS that included fatigue, migraine headaches, numbness in her arms and legs, and pain in her legs, shoulder, and back. Tr. at 494. Dr. Perez-Jorge indicated Plaintiff appeared slightly pale, but he noted no other abnormalities on examination. *Id.* He ordered multiple blood tests and urine cultures and indicated he would see Plaintiff again in two weeks to review the results. Tr. at 495.

On October 8, 2012, Dr. Perez-Jorge indicated Plaintiff had no evidence of fever or infectious disease process. Tr. at 493. He suggested Plaintiff's night sweats may be caused by her medications or an endocrine problem and recommended Plaintiff follow up with her primary care physician. *Id.*

Plaintiff followed up with Dr. Williams on December 4, 2012. Tr. at 456. She indicated taking Motrin at night had helped to prevent flu-like symptoms from Rebif. *Id.*

14

Plaintiff reported constipation, urge incontinence, occasional difficulty swallowing, night sweats, and cognitive problems with word finding difficulties and short-term memory loss. *Id.* Dr. Williams ordered blood work, a barium swallow test, and a speech evaluation and referred Plaintiff to a gastroenterologist. *Id.*

A modified barium swallow study on December 18, 2012, indicated some minimal pharyngeal residue during swallowing, but no evidence of laryngeal penetration or aspiration. Tr. at 469.

On January 22, 2013, Plaintiff presented to Steve Shindell, Ph. D., ABPP, FACPN ("Dr. Shindell"), for a neuropsychological assessment. Tr. at 471–76. Dr. Shindell indicated the test results were an accurate reflection of Plaintiff's abilities, but he later indicated results of the neuropsychological assessment were difficult to discern given Plaintiff's failure on a test of cognitive effort. *Compare* Tr. at 472, *with* Tr. at 473. He specifically stated "[s]he failed a test of effort and as such the following should <u>not</u> be seen as an accurate indication of her current functioning, but rather simply an indication of her lowest possible functioning." Tr. at 473. Plaintiff demonstrated normal thoughts and affable mood. Tr. at 472. She had no looseness of associations or psychotic behavior. *Id.* Plaintiff's husband indicated she had some delusions of theft, spousal affair, and phantom boarders. *Id.* He reported Plaintiff was depressed, irritable, anxious, and showed inappropriate affect. *Id.* He also indicated Plaintiff's sleep pattern had changed. *Id.* Plaintiff was fully oriented and had no problems with basic informational and mental control items. Tr. at 473. Plaintiff demonstrated low average verbal and visual attention

15

and concentration. *Id.* Plaintiff had fair to good verbal and visual memory. *Id.* She scored poorly on a test of delayed contextual memory. *Id.* Her IQ was in the average range, but her processing speed was mildly abnormal in comparison to the other IQ measures. *Id.* She demonstrated no evidence of spelling dyspraxia or acalculia. *Id.* Her language functioning was fair to good. *Id.* Plaintiff achieved normal scores on tests of sensory, perceptual, and motor abilities, but had a mild bilateral decline in motor speed and strength. Tr. at 474. Plaintiff functioned well on tests that required sequencing, logical analysis, and new learning, but she did poorly on tests of general brain integrity. *Id.* Dr. Shindell indicated "[t]he following interpretation needs to be considered in light of cautions noted about the possible impact of over-reporting on the validity of this protocol." *Id.* He proceeded to describe Plaintiff's limitations as follows:

> She is very likely to have a psychological component to her somatic complaints. She is also very likely to be prone to developing physical symptoms in response to stress . . . . She is indeed very likely to be preoccupied with poor health and to complain of sleep disturbance, fatigue, and sexual dysfunction . . . . She is indeed very likely to complain about memory problems, not to cope well with stress, and to experience difficulties in concentration . . . . She is very likely to lack energy and to display vegetative symptoms of depression. She reports various negative emotional experiences and is likely to be inhibited behaviorally by these emotions. She is also likely to be self-critical and guilt-prone . . . . She is indeed very likely to have problems with anger, irritability, and low tolerance for frustration; and to be argumentative. She is also likely to be stress-reactive and worry-prone and to engage in obsessive rumination . . . . She is very likely to be introverted, to have difficulty forming close relationships, and to be emotionally restricted . . . . She is very likely to be asocial.

Tr. at 475. Dr. Shindell deferred all diagnoses and recommended Plaintiff undergo a neuropsychological evaluation by a board-certified neuropsychologist to determine her neuropsychological status. Tr. at 475–76. He indicated Plaintiff's "problems do not appear significant enough to warrant her current driving or vocational limitations . . . ." Tr. at 476.

On January 25, 2013, Plaintiff presented to John W. Schaberg, M.D. ("Dr. Schaberg"), for a gastroenterology consultation. Tr. at 478–79. Dr. Schaberg noted no abnormalities on physical examination. *Id.* He assessed dysphagia and a change in bowel habits. Tr. at 479. He suggested Plaintiff's dysphagia most likely resulted from a motility disorder or a structural problem and indicated a need to rule out polyps, cancer, inflammatory bowel disease, and irritable bowel syndrome. *Id.* He scheduled Plaintiff for upper endoscopy and indicated he would plan further testing based upon its results. *Id.* A progress note from Consultants in Gastroenterology dated January 28, 2013, indicated Plaintiff weighed 269 pounds and had a body mass index of 42.13. Tr. at 480. Plaintiff underwent a colonoscopy on January 31, 2013, which indicated internal hemorrhoids. Tr. at 481–82. On March 4, 2013, Plaintiff underwent esophagogastroduodenoscopy ("EGD"), which revealed erythema in the stomach compatible with gastritis and a stricture in the gastroesophageal junction. Tr. at 484–85. A gastric biopsy was negative. Tr. at 483.

On March 11, 2013, Plaintiff presented to rheumatologist Bryan Wolf, M.D. ("Dr. Wolf"), for consultation regarding chronic discomfort in her hands and periodic pain in

17

her bilateral great toes. Tr. at 487–89. Dr. Wolf observed Plaintiff to have a positive Phalen's test in her bilateral hands, mild bunions at her bilateral first metatarsal phalangeal joints, and palpable tenderness at her right first metatarsal phalangeal joint space. Tr. at 488. The examination was otherwise normal. *Id.* Dr. Wolf assessed carpal tunnel syndrome and prescribed Meloxicam. *Id.* He suggested Plaintiff's bilateral great toe pain was consistent with gouty arthropathy and indicated her uric acid level should be checked. *Id.* He also indicated it would not be unusual for Plaintiff to have a second autoimmune disease in addition to MS and ordered additional blood tests. Tr. at 488–89. He indicated he would review x-rays of Plaintiff's hands and feet for telltale signs of erosion or pathognomonic changes. Tr. at 489.

     C.     The Administrative Proceedings

          1.     The Administrative Hearing

               a.     Plaintiff's Testimony

At the hearing on April 30, 2013, Plaintiff testified she lived with her husband and three children, ages 16, 14, and six. Tr. at 31–32. She stated she was 5'7" tall and weighed 270 pounds. Tr. at 32.

Plaintiff testified she began taking Rebif in 2008, stopped in either 2009 or 2010, and resumed in August 2012. Tr. at 36.

Plaintiff testified she engaged in part-time teaching work in 2011. Tr. at 40. She stated she initially took over teaching a four-hour course for another instructor. *Id.* She indicated she attempted to teach two four-hour courses, but reduced her load to one four-

hour course because of an exacerbation of her MS symptoms, including increased fatigue, migraines, leg pain, and vertigo. Tr. at 40–41.

Plaintiff testified she experienced overwhelming tiredness and an inability to feel rested. Tr. at 41. She stated there were days when she barely had the energy to get out of bed. *Id.* She indicated she experienced intermittent pain in her right leg that was sometimes an irritating and burning numbness and tingling, but was a shooting pain at other times. Tr. at 42. She stated the pain occurred three to four times per week and lasted for a couple hours at a time. *Id.* She complained of three to four migraine headaches per week. Tr. at 43. She testified she took Maxalt and needed to lie down in a dark, quiet room with a fan blowing on her for one to five hours at a time. *Id.* Plaintiff stated she experienced at least five to six migraines per month that required she lie down for four to five hours. Tr. at 44. She indicated her migraines were exacerbated by higher temperatures. *Id.* She stated she had vertigo "all the time," which was accompanied by nausea. Tr. at 45. Plaintiff testified she experienced weakness in her arms and problems with her dexterity. Tr. at 46. She stated she experienced a shock-like sensation in her neck and right shoulder. *Id.* She indicated she experienced some cognitive difficulties when she was speaking and often forgot or slurred words. Tr. at 46–47.

Plaintiff testified she could stand for 30 minutes to an hour at a time. Tr. at 47. She indicated she walked for 40 to 60 minutes on a treadmill, but required a nap afterwards. Tr. at 48. She stated she could sit for about an hour, but indicated her leg became "twitchy" after 30 minutes. *Id.* She testified she developed swelling in her legs and feet

with prolonged sitting and was only able to alternate sitting, standing, and walking for three to four hours before having to lie down. *Id.* She stated she could lift five to 10 pounds with her bilateral hands, but indicated her lifting ability was better on some days than on others. Tr. at 50.

Plaintiff testified she awoke between 11:00 a.m. and 12:00 p.m. daily. Tr. at 37. She indicated she had a driver's license and drove daily to pick up her youngest child from school. Tr. at 33. She stated she cleaned, prepared meals, balanced a checkbook, and shopped for groceries. Tr. at 38. However, she indicated her children also helped with the household chores and that she only did chores on one or two days per week. Tr. at 42. She stated she was unable to do anything more than pick up her children from school on two days per week. Tr. at 50. She testified she had several pets, but stated her children primarily took care of the pets. Tr. at 39. Plaintiff indicated she took her children to doctor's visits and occasionally volunteered at their schools and attended their school events. Tr. at 38, 39. She testified she went on a seven-day mission trip in July 2010 and was able to take a nap during the day. Tr. at 38, 49. She indicated she went to bed around 9:00 to 10:00 p.m., but did not fall asleep until 11:00 p.m. or 12:00 a.m. Tr. at 39.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Nancy Hughes reviewed the record and testified at the hearing. Tr. at 51. The VE categorized Plaintiff's PRW as a medical records clerk, *Dictionary of Occupational Titles* ("*DOT*") number 245.361-010, which is light and semi-skilled with a specific vocational preparation ("SVP") of four; a medical coding

clerk, *DOT* number 079.262-014, which is sedentary and skilled with an SVP of seven; a hospitality manager, *DOT* number 359.137-010, which is light and skilled with an SVP of six; a travel agent, *DOT* number 252.152-010, which is sedentary and skilled with an SVP of four; and a preventive maintenance coordinator, *DOT* number 169.167-074, which is light and skilled with an SVP of seven. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday, never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; was limited to frequently feeling on the right; and should avoid all exposure to hazards. Tr. at 52. The VE testified that the hypothetical individual could perform all of Plaintiff's PRW. *Id.*

The ALJ next described an individual of Plaintiff's vocational profile who could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; was limited to frequent feeling on the right; and should avoid all exposure to hazards. Tr. at 53. The ALJ asked if this individual could perform Plaintiff's PRW. *Id.* The VE responded "[a]mong the jobs, Your Honor, maybe medical coder, hospitality manager, I'm sorry, medical coder should be travel agent." *Id.*

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as stated in Plaintiff's testimony. Tr. at 53–54. She asked if the individual would be able to perform Plaintiff's past work or any other work available in the local or national economy. Tr. at 54. The VE responded that she would not. *Id.*

The ALJ asked the VE if her testimony was consistent with the *DOT*, the *Selected Characteristics of Occupations Defined in the Revised Dictionary Occupational Titles* ("*SCO*"), and supporting publications. *Id.* The VE responded "[y]es."

Plaintiff's attorney asked the VE to assume the individual would miss two unscheduled days of work per week. *Id.* He asked if the individual would be able to perform any jobs. *Id.* The VE responded that no full-time work could be performed. *Id.* He then asked the VE to assume the individual would have three or more unscheduled absences per month. *Id.* He asked if the individual could perform any jobs. *Id.* The VE responded "[n]o." Plaintiff's attorney asked the VE to assume the individual would have to lie down for two hours after engaging in work for four hours. *Id.* He asked if the individual could perform any work on a full-time basis. *Id.* The VE responded that the individual could not. *Id.*

## 2.     The ALJ's Findings

In his decision dated July 5, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

2.    The claimant has not engaged in substantial gainful activity since March 31, 2008, the alleged onset date (20 CFR 404.1571 *et. seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: multiple sclerosis, status post cervical fusion, migraines, vertigo, status post lap banding, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can carry lift and/or carry ten pounds occasionally and less than ten pounds frequently. She can stand and/or walk at least two hours in an eight-hour workday. The claimant can sit for about six hours in an eight-hour workday. However, the claimant can never climb ladders, ropes, or scaffolds but she can occasionally climb ramps or stairs. In addition, the claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant would be limited to frequent feeling on the right upper extremity but she would have no feeling limitations on the left. Furthermore, the claimant must avoid all exposure to hazards.

6.    The claimant is capable of performing past relevant work as a Medical Coding Clerk and a Travel Agent. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 12–20.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly assess Plaintiff's credibility;

2)    the ALJ did not appropriately consider the opinion evidence;

3)    the ALJ did not consider limitations imposed by migraine headaches and cognitive impairment in assessing Plaintiff's RFC; and

4)    the ALJ improperly concluded Plaintiff was capable of performing her PRW.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

        1.    Plaintiff's Credibility

Plaintiff argues the ALJ erred in finding that her testimony was unsupported by the record and lacked credibility. [ECF No. 7 at 8]. She maintains the ALJ cherry-picked the record to support her conclusion and ignored evidence to the contrary. *Id.* at 9. She contends the ALJ erroneously found her to be non-compliant because she did not present evidence to support her claim that she was unable to afford treatment at times, but argues the ALJ did not give her an opportunity to show good cause for her failure to obtain

treatment due to financial hardship. ECF Nos. 7 at 11 and 9 at 2. Finally, she contends the ALJ disregarded some evidence without weighing it and without explaining her reasons for disregarding it. [ECF No. 7 at 13].

The Commissioner argues the ALJ relied upon legally-sufficient reasons to conclude that Plaintiff's statements were not entirely credible. [ECF No. 8 at 25]. She maintains the ALJ based her conclusion on Plaintiff's activities of daily living and continued work activity, the objective diagnostic evidence, Dr. Shindell's opinion, Dr. Goots' opinion, Dr. Kaufman's clinical findings and opinion, Plaintiff's indications regarding the effectiveness of her medications, the physical therapy notes, Plaintiff's treatment history and the fact that she did not attempt to obtain low-cost or no-cost treatment, and the clinical findings of Drs. Garde, Jones, and Wolf. *Id.* at 26–27. She contends the ALJ was not required to address the evidence that supported Plaintiff's statements, but was only required to cite substantial evidence to support her conclusion. *Id.* at 27. She argues it was Plaintiff's burden to prove she was unable to afford treatment. *Id.* Finally, she maintains it is not this court's duty to reweigh the evidence. *Id.* at 28.

Allegations of pain or other symptoms in the absence of medical signs and laboratory findings demonstrating the existence of a medically-determinable impairment cannot be the basis for a disability finding. SSR 96-7p. The ALJ should only consider the intensity, persistence, and functionally-limiting effects of symptoms after the claimant has established the existence of a medically-determinable impairment. *Id.* However, once a claimant has established the existence of a condition reasonably likely to cause the

alleged symptoms, she may "rely exclusively on subjective evidence to prove the second part of the test." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). "[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. SSR 96-7p. To assess the credibility of the claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard the claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.* Furthermore, the ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* The ALJ's decision must clearly indicate the weight accorded to the claimant's statements and the reasons for that weight. *Id.* Although this court must confer deference on the ALJ's findings of fact, the court is not required to "credit even those findings contradicted by undisputed evidence." *Hines*, 453 F.3d at 566, citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion . . . .").

To assess the credibility of a claimant's statements, the ALJ must consider the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and

aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes per hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restriction due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Pursuant to 20 C.F.R. §§ 404.1530 and 416.930, a claimant who neglects to follow prescribed treatment without good reasons cannot be found disabled. "[A]n individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p. However, the ALJ must not draw negative inferences regarding a claimant's symptoms and their functional effects based on a failure to obtain treatment without first considering the claimant's explanation for her failure to obtain treatment. 20 C.F.R. §§ 404.1530 and 416.930, SSR 96–7p. Fourth Circuit precedent directs that ALJs may not deny benefits to claimants who lack the financial resources to obtain treatment. *See Lovejoy v. Heckler,* 790 F.2d 1114, 1117 (4th Cir.1986) (holding that the ALJ erred in determining that the plaintiff's impairment was not severe based on her failure to seek treatment where the record reflected that she could not afford treatment); *Gordon v.*

*Schweiker,* 725 F.2d 231, 237 (4th Cir.1984) ("it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him"). When a claimant alleges an inability to afford treatment and an ALJ considers the failure to obtain treatment as a factor that lessens the claimant's credibility, the ALJ must make specific findings regarding the claimant's ability to afford treatment. *See Dozier v. Colvin*, C/A No. 1:14-29-DCN, 2015 WL 4726949, at *4 (D.S.C. Aug. 10, 2015) (remanding the case because the ALJ did not include specific factual findings regarding the resources available to the plaintiff and whether "her failure to seek additional medical treatment was based upon her alleged inability to pay"); *Buckley v. Commissioner of Social Sec. Admin.*, C/A No. 1:14-124-TLW, 2015 WL 3536622, at *21 (D.S.C. Jun. 4, 2015) (finding the ALJ adequately considered the claimant's allegation that she lacked the financial resources to obtain treatment as part of the credibility determination where the ALJ cited specific evidence in the record that contradicted the claimant's allegation); *Gadsden v. Colvin*, C/A No. 4:12-2530, 2014 WL 368216, at *4 (D.S.C. Feb. 3, 2014) ("On remand the ALJ should make factual findings regarding Gadsden's financial situation and its impact on her ability to seek medical treatment. To the extent that the ALJ continues to find that Gadsden's lack of medical treatment lessens her credibility, the ALJ should refer specifically to the evidence that informs his conclusions, taking care that he does not penalize Gadsden for failing to seek treatment that she could not afford").

The ALJ set forth some of Plaintiff's alleged symptoms and limitations, but indicated "[d]espite these allegations, the claimant completes household chores, cooks, shops, attends to all her personal care needs, pays bills, takes and picks up her children from school daily." Tr. at 16. She concluded "[t]he claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations, which weakens the credibility of her allegations." Tr. at 16–17. She noted "[t]he claimant also testified that she traveled to Guatemala in 2010 for a seven day mission trip to help set up schools and teach, which she described was at least sedentary work." Tr. at 17. She stated "[a]lthough travelling [sic] on a mission trip and a disability are not mutually exclusive, the claimant's decision to go on the mission trip tends to suggest that her alleged symptoms and limitations may have been overstated." *Id.* The ALJ then turned to the medical evidence and found that the objective evidence failed "to provide strong support for the claimant's allegations of disabling symptoms and limitations." Tr. at 17. After discussing some of the medical evidence, the ALJ stated the following:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. The claimant's activities of daily living, work history, and objective medical evidence are not consistent with her allegations of disabling pain and symptoms. Again, she has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. As noted above, the claimant cooks, cleans, shops, drives, and pays bills. Such activities are commensurate with work at the sedentary exertional

level. In addition, the claimant has worked after the alleged onset date. Although this work did not qualify as substantial gainful activity, it is inconsistent with her allegations that she is incapable of all work.

Finally, the objective medical evidence does not support the full extent of the claimant's allegations. Despite the complaints of allegedly disabling symptoms, there have been significant periods of time since the alleged onset date during which the claimant has not taken any medications for those symptoms. Nonetheless, when taking the medication, the medical evidence reveals that the medications were relatively effective in controlling her symptoms. While compliant with her treatment, physical examinations were normal and radiological evidence showed mild findings. Although the claimant reported that she could no longer afford treatment, there is no evidence that she could not have obtained low cost or no cost medical care as necessary if she were truly impoverished to the extent alleged. Nevertheless, I find that the claimant is at least partially credible as reflected in the above residual functional capacity.

Tr. at 18–19.

The undersigned recommends the court find the ALJ did not properly consider Plaintiff's credibility. Although the ALJ cited Plaintiff's daily activities as a significant factor that weighed against her allegations of disabling pain, the ALJ neglected to consider that portion of Plaintiff's testimony in which she indicated her daily activities were limited to an extent that was inconsistent with the performance of substantial gainful work activity. While Plaintiff testified she picked up her children from school, prepared meals, and performed some household chores, she also testified she did not get up until between 11:00 a.m. and 12:00 p.m. daily and was unable to do anything more than pick up her children from school on two days per week. Tr. at 37, 50. The ALJ considered the mission trip to Guatemala that Plaintiff took in 2010 as indicative of her ability to work, but failed to consider Plaintiff's testimony that she rested for a significant

period in the middle of the day while performing the mission work. Tr. at 38, 49. The ALJ found Plaintiff was less credible because she worked after her alleged onset date, but she failed to consider Plaintiff's testimony that she was only able to teach one four-hour course and that she eventually stopped teaching because it exacerbated her MS symptoms. Tr. at 40–41.

The ALJ also found that the objective medical evidence was not consistent with Plaintiff's allegations of disabling pain and symptoms, but she ignored the effects of Plaintiff's subjective complaints. It is impossible to gauge the extent of Plaintiff's fatigue or pain or the frequency of her migraines through any objective tests, but the record reflects that Plaintiff often complained to her treating and examining physicians of pain, fatigue, and frequent migraine headaches. Tr. at 325, 326, 373–74, 381, 390, 422, 452, 464, 494. Having established that she had conditions reasonably likely to cause the alleged symptoms based on her diagnoses of MS and migraine headaches and her history of cervical fusion, Plaintiff could "rely exclusively on subjective evidence" to prove her pain and fatigue were disabling. *See Hines*, 453 F.3d at 565. The ALJ erred to the extent that she relied upon a lack of objective findings to undermine Plaintiff's subjective complaints.

The undersigned also recommends a finding that the ALJ erred in considering lapses in Plaintiff's medical treatment and medication to dismiss her allegations of disabling pain and symptoms. Dr. Cooper indicated Plaintiff was unable to afford treatment with her neurologist or medication for MS because of financial hardship. Tr. at

326, 328. Although the ALJ acknowledged Plaintiff's reports that she could not afford treatment, she concluded that there was "no evidence that she could not have obtained low cost or no cost medical care as necessary if she were truly impoverished to the extent alleged." Tr. at 18–19. In reaching this conclusion, the ALJ failed to satisfy her burden to disprove Plaintiff's allegation that she could not afford treatment and instead shifted the burden to Plaintiff to prove she was unable to afford treatment. The Fourth Circuit and this court have explained that when a claimant alleges an inability to afford treatment, the ALJ cannot deny benefits without considering the validity of the allegation and making specific findings regarding the claimant's ability to afford treatment. *See Lovejoy,* 790 F.2d at 1117; *Gordon,* 725 F.2d at 237; *Dozier,* 2015 WL 4726949, at *4; *Buckley*, 2015 WL 3536622, at *21; *Gadsden*, 2014 WL 368216, at *4. Because the ALJ failed to make specific findings regarding the resources available to Plaintiff and whether her failure to seek additional treatment and medication was based upon her inability to pay, the undersigned recommends the court find the ALJ did not satisfy the burden required to use a lack of medical treatment as a reason for discounting Plaintiff's credibility.

2.     Medical Opinions

Plaintiff argues the ALJ failed to articulate sufficient reasons for discounting Dr. DePace's opinion. [ECF No. 7 at 12]. She maintains the ALJ gave great weight to Dr. Shindell's opinion without addressing aspects of the opinion that were inconsistent with the record and with Dr. Shindell's observations. *Id.*

The Commissioner argues the ALJ provided sufficient justification for negating Dr. DePace's opinion, noting that his opinion was inconsistent with Plaintiff's daily activities. [ECF No. 8 at 30]. She maintains the ALJ's conclusion to accord great weight to Dr. Shindell's opinion was supported by Dr. Shindell's observations and diagnostic testing and with Plaintiff's daily activities. *Id.* at 31.

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p *quoting* 20 C.F.R. §§ 404.1527(a) and 416.927(a). ALJs must consider all medical opinions in the record. 20 C.F.R. §§ 404.1527(b), 416.927(b). If a treating physician provides a medical opinion, that opinion is entitled to deference and may be entitled to controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. *Morgan v. Barnhart*, 142 F. App'x 716, 727 (4th Cir. 2005); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, if a treating physician declines to provide a medical opinion or if the ALJ does not accord controlling weight to a treating physician's opinion, the ALJ must weigh all opinion evidence based on (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and the frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the

medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

ALJs are guided in weighing the medical opinions of record by 20 C.F.R. §§ 404.1527 and 416.927. Pursuant to 20 C.F.R. § 404.1527(c)(3) and 416.927(c)(3), ALJs should give more weight to medical opinions that are adequately explained by the medical providers and supported by medical signs and laboratory findings than to unsupported and unexplained opinions. "The medical source opinion regulations indicate that the more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[4] In addition, ALJ's are directed to give greater weight to opinions from specialists that address medical issues related to their areas of specialty than to opinions from physicians regarding conditions outside their area of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). ALJs should also consider any additional factors that tend to support or contradict medical opinions in the record. 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6).

The ALJ gave little weight to Dr. DePace's opinion that Plaintiff could only perform three-step commands because it was "inconsistent with the claimant's reported

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

activities of daily living when she manages a household, cares for her children, and performs volunteer work (Ex. 11F, pg. 5)." Tr. at 13. She gave great weight to Dr. Shindell's opinion that Plaintiff's impairments did not appear significant enough to warrant vocational limitations because it was "internally consistent with his diagnostic testing and with the claimant's reported activities of daily living (Ex. 20 F, pg. 7)." *Id.*

The undersigned first notes that the opinions of Drs. DePace and Shindell are not necessarily at odds with one another. Dr. DePace indicated Plaintiff "continues to be able to perform three-step commands," but he did not indicate she was incapable of performing more complicated tasks. *See* Tr. at 398. Dr. Shindell indicated Plaintiff problems did not "appear significant enough to warrant her current driving or vocational limitations." Tr. at 476. However, Dr. Shindell was commenting on the level of vocational restrictions Plaintiff described as opposed to her ability to perform three-step commands.

To the extent the ALJ recognized inconsistencies between the opinions of Drs. DePace and Shindell, the undersigned recommends a finding that she adequately explained her decision to accord greater weight to Dr. Shindell's opinion. The "examining" factor weighed equally because Dr. DePace and Dr. Shindell provided one-time consultations. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). The ALJ concluded that the supportability factor lent greater weight to Dr. Shindell's opinion than to that of Dr. DePace, and her conclusion was sustained by the fact that Dr. Shindell conducted more extensive testing than that performed by Dr. DePace. *Compare* Tr. at 395–98, *with*

Tr. at 471–76; *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). The ALJ also concluded that the consistency factor weighed in favor of Dr. Shindell's opinion because Plaintiff's daily activities were more consistent with Dr. Shindell's findings than with those of Dr. DePace. Tr. at 13, *see also* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Finally, the ALJ pointed to the specialization factor to further support her decision, noting that Dr. Shindell was a neuropsychologist. *Id.*; *see also* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). In light of the foregoing, the undersigned concludes that the ALJ complied with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 in weighing the medical opinions and provided sufficient reasons for concluding that Dr. Shindell's opinion was entitled to greater weight than that of Dr. DePace.

### 3. Limitations Resulting from Migraine Headaches and Cognitive Disorder

Plaintiff argues the ALJ failed to include in her RFC assessment limitations resulting from migraine headaches, despite a plethora of evidence in the record to support their frequency and limiting effects. [ECF No. 7 at 13–14]. She further contends the ALJ did not adequately consider her cognitive limitations even though the limitations were supported by diagnostic testing. *Id.* at 15.

The Commissioner argues the ALJ specifically addressed Plaintiff's migraine headaches, but concluded they were controlled by medications and were not as limiting as Plaintiff alleged. [ECF No. 8 at 28–29]. She maintains the ALJ accounted for the credibly-established limitations imposed by Plaintiff's migraine headaches by limiting

her to sedentary work that did not require her to climb ladders, ropes, or scaffolds or be exposed to hazards. *Id.* at 30. She contends Plaintiff's cognitive impairment did not cause more than minimal limitation in her ability to perform basic work activity. *Id.*

As part of the RFC assessment, the ALJ must identify the limitations imposed by the claimant's impairments and assess her work-related abilities on a function-by-function basis. SSR 96-8p. "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.* The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Plaintiff specifically points to her migraine headaches and cognitive impairment as factors that were not adequately considered as part of the ALJs RFC assessment. The ALJ considered Plaintiff's migraine headaches to be a severe impairment, but found they

were effectively treated with medications, despite Plaintiff's testimony that she continued to have them for one to five hours at a time on three to four days per week. *Compare* Tr. at 17, *with* Tr. at 43. The ALJ found that cognitive disorder, NOS, did not cause more than minimal limitations in Plaintiff's ability to perform basic mental work activities and was non-severe, despite Plaintiff's endorsement of difficulty with word finding and memory. Tr. at 13.

The undersigned recommends the court find the ALJ did not adequately account for the limitations imposed by Plaintiff's migraine headaches in assessing her RFC. Contrary to the ALJ's conclusion, the record contains evidence that suggests Plaintiff's migraines continued to occur on a frequent basis and were not entirely responsive to prescribed medications. On July 23, 2008, Dr. Kaufman noted that Plaintiff had discontinued Topamax because she did not believe it reduced the frequency of her migraines. Tr. at 416. Plaintiff again complained of migraines on September 22, 2010. Tr. at 326. On March 23, 2011, Dr. Cooper indicated nine Imitrex tablets typically lasted Plaintiff one to one-and-a-half months, but Plaintiff had four days of migraines in a row the prior week. Tr. at 325. Plaintiff reported experiencing three to five migraines per week on September 20, 2011, and stated she used Imitrex to treat her migraines once or twice a week. Tr. at 381. During the consultative examination with Dr. Jones on January 31, 2012, Plaintiff indicated she experienced three to four migraine headaches per week. Tr. at 390. Plaintiff reported a recent increase in migraines to Dr. Cooper on August 23, 2012, and Dr. Cooper noted that prophylactic medications were ineffective in the past

41

and that Imitrex was no longer effectively treating Plaintiff's migraines. Tr. at 452. Plaintiff indicated in her testimony that her migraine headaches necessitated she lie down for extended periods several times per week and for a majority of the day on five to six days per month. Tr. at 43–44. Given the medical evidence of record and Plaintiff's testimony, the undersigned finds that the ALJ failed to consider Plaintiff's capacity to complete a normal workday and workweek in light of the frequency of her migraine headaches. *See Mascio*, 780 F.3d at 636; SSR 96-8p.

As for Plaintiff's cognitive abilities, the undersigned notes that both Dr. DePace and Dr. Shindell observed Plaintiff to have deficits in processing speed. Tr. at 398, 473–74. Upon remand, the ALJ should consider Plaintiff's processing speed deficit in determining her RFC.

### 4.      Plaintiff's Ability to Perform PRW

Plaintiff argues the ALJ erred in finding that she was capable of performing her PRW. [ECF No. 7 at 16]. She maintains that, although the ALJ found she could perform less than the full range of sedentary work, she did not engage in the necessary inquiry to determine whether an individual with all of the restrictions assessed in the RFC would be capable of engaging in Plaintiff's PRW. *Id.* at 17.

The Commissioner argues the decision to use a vocational expert was in the discretion of the ALJ and that the ALJ was not required to accept the VE's opinion. [ECF No. 8 at 32]. She maintains the ALJ did not rely on the VE's testimony to conclude

42

Plaintiff was capable of engaging in her PRW, but instead relied on the job descriptions in the *DOT*. *Id.* at 32–33.

Plaintiff counters that, although the ALJ was not required to use a VE, it was not within the ALJ's discretion to disregard the VE's testimony that she solicited merely because it was contrary to her conclusion regarding Plaintiff's ability to perform PRW. [ECF No. 9 at 3–4].

In making disability determinations, ALJs should primarily rely upon the *DOT*. SSR 00-4p. If required to decide a complex issue, such as whether job skills may be transferred to other work or the specific jobs that may be performed in light of vocational restrictions, ALJs may rely upon the testimony of vocational experts. 20 C.F.R. §§ 404.1566(e), 416.966(e). VE testimony should generally be consistent with the *DOT*. SSR 00-4p. However, "[w]hen there is an apparent unresolved conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." *Id.* Neither the *DOT* nor the VE testimony automatically carries higher weight. *Id.* "If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict." *Id.* It is the ALJ's duty to resolve the conflict between the *DOT* and the VE's testimony and to explain how the conflict was resolved. *Id.*

The procedure the Social Security Administration ("SSA") uses at step four of the sequential analysis when determining whether the claimant's RFC permits her to return to

43

her PRW are set forth in SSR 82-62. The ALJ must consider whether a claimant has the RFC to meet the physical and mental demands of her past work and, if she can return to her PRW, she may be found "not disabled." SSR 82-62. The Ruling provides the following detail regarding what an ALJ is to consider in the decision:

> Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.
>
> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

*Id.* "In reviewing disability claims, the Administrative Law Judge must determine precisely the activities involved in the claimant's former job or occupation and the activities that the claimant is capable of performing." *Harris v. Secretary, Dept. of Health and Human Services*, 866 F.2d 1415 (Table), 1989 WL 7013, at *2 (4th Cir. Jan. 27, 1989), citing *Parker v. Harris*, 626 F.2d 225 (2d Cir. 1980).

The ALJ concluded the claimant was capable of performing her PRW as a medical coding clerk and travel agent because those jobs did not "require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR

44

404.1565 and 416.965).” Tr. at 19. The ALJ found that Plaintiff worked in the vocationally-relevant past for sufficient time periods to acquire the experience necessary to perform the jobs of medical coding clerk and travel agent. Tr. at 19. The ALJ further indicated the following: “The Dictionary of Occupational Titles lists the occupations of Medical Coding Clerk and a Travel Agent as sedentary exertional work. In comparing the claimant’s residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed.” Tr. at 20.

The undersigned recommends the court find the ALJ did not properly assess Plaintiff’s ability to perform her PRW based on the requirements of SSRs 82-62 and 00-4p. The VE testified that the restrictions set forth by the ALJ in the RFC assessment would allow for the performance of Plaintiff’s PRW as a hospitality manager and travel agent, but the ALJ found Plaintiff could perform her PRW as a medical coding clerk and travel agent. *Compare* Tr. at 53, *with* Tr. at 19–20. The VE also expressed some uncertainty regarding the individual’s ability to perform Plaintiff’s PRW, using the word “maybe” before identifying the jobs, but the ALJ did not question the VE about her hesitation. *See* Tr. at 53. Although ALJs may rely exclusive on the *DOT* and are not required to obtain the services of vocational experts, once an ALJ elicits a VE’s testimony, the ALJ must resolve any conflicts between the VE’s testimony and the information contained in the *DOT*. *See* SSR 00-4p; *see also Gosnell v. Astrue*, C/A No. 4:09-3142-RMG, 2011 WL 124449, at *2 (D.S.C. Jan. 14, 2011) (“Neither the DOT nor

45

the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict . . . ."). While the ALJ cited to the *DOT*, she failed to resolve or even acknowledge that her finding conflicted with the testimony of the VE that an individual with the restrictions set forth in the RFC assessment would not be able to perform Plaintiff's PRW of medical coding clerk. In addition, the ALJ failed to seek clarification regarding the VE's statement that the individual could "maybe" perform the jobs of hospitality manager and travel agent. Therefore, the ALJ did not satisfy her duty to resolve conflicts in the vocational evidence as required by SSR 00-4p. Furthermore, because SSR 82-62 requires "careful appraisal" of the claimant's PRW and ability to perform that work in light of the restrictions set forth in the RFC assessment, the undersigned finds the ALJ did not comply with the requirements of SSR 82-62.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

August 19, 2015                              Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).